MIDWESTERN GAS TRANSMISSION COMPANY, and Tennessee Gas Transmission Company, Corporations, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

Natural Gas Pipeline Company of America, Texas Illinois Natural Gas Pipeline Company, Chicago District Pipeline Company, Colorado Interstate Gas Company, Pacific Northwest Pipeline Corporation, Intervenors.

No. 13954.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 21, 1958.

Decided May 13, 1958.

Petition for Rehearing Denied June 18, 1958.

Mr. Harry S. Littman, Washington, D. C., with whom Messrs. William C. Braden, Jr., Houston, Tex., Jack Werner, Dale A. Wright, John D. Lane and Lambert McAllister, Washington, D. C., were on the brief, for petitioners.

Mr. Howard E. Wahrenbrock, Solicitor, Federal Power Commission, with whom Messrs. Willard W. Gatchell, Gen. Counsel, Robert Lee Russell, Asst. Gen. Counsel, Federal Power Commission, and Alvin A. Kurtz, Atty., Federal Power Commission, were on the brief, for respondent.

Mr. Clarence H. Ross, Chicago, Ill., with whom Messrs. John A. Kratz, Washington, D. C., and Everett I. Willis, New York City, were on the brief, for intervenors Natural Gas Pipeline Co. of America, Texas Illinois Natural Gas Pipeline Co., and Chicago District Pipeline Co.

Messrs. James Lawrence White, New York City, and John Fleming Kelly, Denver, Colo., were on the brief for intervenor Colorado Interstate Gas Co. Mr. Norman A. Flaningam, Washington, D. C., also entered an appearance for intervenor Colorado Interstate Gas Co.

Messrs. Charles E. McGee, Washington, D. C., and Francis H. Caskin, Danvers, Mass., entered appearances for intervenor Pacific Northwest Pipeline Corp.

Before REED, Associate Justice of the Supreme Court, retired*, and EDGERTON, Chief Judge, and BAZELON, Circuit Judge.

BAZELON, Circuit Judge.

Review is sought, pursuant to § 19(b) of the Natural Gas Act,[1] of two orders

---

* Sitting by designation pursuant to the provisions of 28 U.S.C. § 294(a).

1. 52 Stat. 831 (1938), 15 U.S.C.A. § 717r (b).

of the Federal Power Commission, one a severance order issued March 13, 1957, and the other a consolidation order issued March 29, 1957.

## I

### The Application

Petitioners Midwestern Gas Transmission Company (Midwestern) and Tennessee Gas Transmission Company (Tennessee) are proponents of a new pipeline system designed to supply natural gas to the Chicago-Gary area of northern Illinois-Indiana, the states of Wisconsin and Minnesota, eastern North Dakota and western Michigan. Intervenors Natural Gas Pipeline Company (Natural), Texas Illinois Natural Gas Pipeline Company (Texas Illinois), and Chicago District Pipeline Company (Chicago District) are subsidiaries of Peoples Gas Light and Coke Company (Peoples), the distributor of natural gas in the Chicago area. Natural and Texas Illinois are the suppliers in Peoples system. Chicago District operates a short line transporting the gas from the Natural and Texas Illinois lines into Peoples' distribution lines.

The Peoples system operates a substantial monopoly in the natural gas business in northern Illinois-Indiana.[2] Despite the large quantities of gas brought into the area by the Peoples system, there is a large demand which cannot be met with the system's present capacity. In the city of Chicago alone, for example, there was a waiting list of 154,800 applicants for gas service as of the end of 1956.

Gas demand beyond existing capacity is a problem not only in the area served by the Peoples system, but all through the middle west. Serious gas shortages are experienced, for example, in the state of Wisconsin, which is served principally by the Michigan Wisconsin Pipe Line Company (Michigan Wisconsin), and in the state of Minnesota, which is served only by the Northern Natural Gas Company (Northern).

On October 10, 1955, Midwestern filed an application for a certificate of public convenience and necessity for a new pipeline system to run from a connection with Tennessee's system at Portland, Tennessee, to a connection with the system of Trans-Canada Pipe Lines Limited (Trans-Canada) at the Canadian border, near Emerson, Manitoba. Midwestern has contracts with both Tennessee and Trans-Canada for the purchase from each of 204,000 m.c.f.[3] of gas per day. The contract with Trans-Canada also gives Midwestern the right to purchase an additional 200,000 m.c.f. per day depending upon availability.[4] And the southern portion of Midwestern's proposed line, though designed to carry northward only the 204,000 m.c.f. to be purchased from Tennessee, "could, without additional looping but simply with added compression, carry as much as 350,000 m.c.f a day to the Chicago area * * *."[5] Midwestern's proposed line is to be so located as to be able to deliver gas to the shortage areas in northern Illinois-Indiana now served by the Peoples system, as well as to those in Wisconsin, Minnesota, western Michigan, and eastern North Dakota. And Midwestern made clear to the Commission that its intention is to serve all of the areas within economic reach of its line and that "if certificated it will, in the future, in the course of normal growth and development, serve, like all other pipelines and distributors, any available loads for which authorization can be obtained."[6]

In its original application, Midwestern specified the customers to whom it would

---

2. The monopoly is complete as to supply and, in the city of Chicago, as to distribution, but other companies share in the distribution function in the remainder of the area.

3. The abbreviation represents "thousand cubic feet."

4. Midwestern Gas Transmission Company, et al., 16 F.P.C. 466, 470 (1956).

5. Id. at 482.

6. Id. at 478.

deliver 315,202 m.c.f. per day and left 86,372 m.c.f. per day as a reserve for additional sales. In its first supplement to its application on November 2, 1955, Midwestern stated that this reserve was designed to supply other customers within reach of its line who are presently without gas or receiving short supplies. It stated further that specification of some distributors was made difficult by their fear of the displeasure of their present suppliers. In a further supplement on December 1, 1955, Midwestern proposed to sell its reserved gas to the existing pipelines, including those in the Peoples system, for resale by them to their distributors.[7] If those pipelines declined to buy the reserved gas, Midwestern proposed to sell it directly to their distributors and to industries located within economic reach.

On December 22, 1955, Peoples and its subsidiaries petitioned to intervene in the proceeding on Midwestern's application. Both Natural and Texas Illinois, in their petitions, declared that they have "no intention of purchasing gas from Midwestern"; and Peoples, in its own petition, stated that "all natural gas sold by Peoples Gas * * * is purchased by it from Natural * * * and Texas Illinois * * * and it is contemplated that said companies will continue to supply Peoples Gas' requirements of flow gas in increased volumes as the orderly development of Peoples Gas' markets shall, from time to time, require." Being thus informed that the Peoples system would not purchase its reserved gas,[8] Midwestern, on February 7, 1956, filed a further supplement to its application specifying all the customers to whom it proposed to sell 395,998 m.c.f. of gas per day.[9] It named the various distributors who would receive 280,998 m.c.f. per day and resell it to customers in Wisconsin, Minnesota, western Michigan and eastern North Dakota. The only customers named in the northern Illinois-Indiana area were the United States Steel Corporation and the Inland Steel Company, to whom direct sales of 115,000 m.c.f. per day would be made. Obviously, no further specification could be made of proposed sales in the area served by the Peoples system in view of the latter's control of the distribution system and its refusal to buy from Midwestern.[10] But a Midwestern officer testified:

> "* * * we are not seeking to serve only a portion of these markets for a short time. We intend to serve all of the markets and meet every reasonable service demand from them.
>
> \* \* \* \* \*
>
> "Midwestern is seeking to serve all those areas which are economically feasible to serve all the way from its line from Emerson, Manitoba, to Kankakee, Illinois * * *.
>
> "* * * as a policy, Midwestern will propose to render service to substantially all areas within economic distance of its lines.

7. Midwestern informed the Commission that it "offered to sell large quantities of natural gas to [the Peoples system] at a price substantially less than the incremental cost of the new gas supply proposed" in Peoples' own expansion plans.

8. As the presiding examiner put it in his opinion denying Peoples' motion to dismiss Midwestern's application, "for reasons not yet explained in the record, some of the movements [the Peoples companies] have refused to purchase gas at wholesale from Midwestern, preferring instead to attempt to obtain their additional requirements from other sources." 16 F.P.C. at 481.

9. The quantities proposed to be delivered are the estimated fifth-year peak-day requirements of the named customers. Obviously, original deliveries will be much lower, so that Midwestern, if it constructs its facilities more rapidly than the demand grows, may have a considerable uncommitted reserve capacity in the early stages of operation.

10. Distributors of Peoples system gas in the northern Illinois-Indiana area, other than Peoples itself, were approached by Midwestern, but, though they all need more gas than the Peoples system is supplying, would not commit themselves to buying from Midwestern.

"* * * In Chicago and Northern Indiana, north of Kankakee, Peoples Gas Light and Coke Company and their subsidiary pipeline companies have been serving under a policy of scarcity and we hope to make gas available in that area."

What Midwestern's proposal comes to, then, is an undertaking to bring into a large gas shortage area over 400,000 m.c.f. of gas per day, with very considerable future expandability, to supply any customer within economic reach, the only presently specifiable customers in the northern Illinois-Indiana area being the two steel companies.

The Minnesota area sought to be served by Midwestern is also sought to be served by Northern under an application for a certificate for expansion of its system. Some 58 communities are designated for service under both proposals. The Wisconsin area proposed to be served by Midwestern is also proposed to be served by Michigan Wisconsin under an application for a certificate for expansion of its system. Most of the communities which the latter proposes to serve are also to receive service under Midwestern's proposal. The Commission accordingly consolidated the applications of Midwestern, Northern and Michigan Wisconsin [11] for comparative hearing.

The extent to which Midwestern's proposal affected the Peoples system is indicated by the petitions to intervene filed by the system companies. Natural, for example, alleged that "it is clear that Midwestern and/or Tennessee intend to compete with Natural for the sale of gas in Natural's existing markets; that Natural has a substantial economic interest that will be directly affected by the proposals of Midwestern and Tennessee; and that the proper protection of both

Natural and the public which it serves requires the full participation by Natural in each of such dockets." [12] The various Peoples companies were granted intervention in Midwestern's case and participated as parties in the hearings thereon. On February 14, 1956, the day those hearings began, Natural filed its own application for a certificate authorizing an expansion of service. And in his opening statement at the hearing, Natural's counsel, referring to the program of "expansion of gas service by the Peoples companies, of which the application filed today by Natural is but another important step." declared, "The Midwestern project is completely incompatible with this program."

The substance of Natural's application, as supplemented by applications later filed by Chicago District, Colorado Interstate Gas Company (Colorado Interstate), and Pacific Northwest Pipeline Corporation (Pacific Northwest), is a proposal to bring into the northern Illinois-Indiana area an additional 485,000 m.c.f of gas per day, which amount includes 115,000 m.c.f. per day to be sold to Peoples and another distributor for resale to the same two steel companies proposed to be served by Midwestern. To carry the increased capacity, Natural's present facilities are to be expanded by adding pipe along 415 miles of its line and by supercharging all its main line compressor stations. To carry the added gas to the distributors from Natural's line at Joliet, Chicago District is to expand its facilities. About 95 per cent of the additional gas is to be supplied to Natural by Colorado Interstate, which will expand its facilities for that purpose. Colorado Interstate, in turn, is to obtain 117,500 m.c.f. per day from Pacific Northwest, requiring an expansion of the latter's facilities as well. [13]

11. Also consolidated in this proceeding were the related applications supporting each of the three principal applications, e. g., Tennessee's application for a certificate for additional facilities required to supply gas to Midwestern.

12. A similar allegation was made by Texas Illinois. Chicago District and Peoples itself likewise claimed an economic interest in Midwestern's proposal.

13. An interrelated application was also filed by Texas Illinois proposing to de-

## II

### Proceedings before the Commission

On September 14, 1956, the Commission consolidated for joint processing Natural's application and the interrelated applications of Chicago District, Texas Illinois, Colorado Interstate and Pacific Northwest. On September 24, 1956, it granted the petition of Midwestern and Tennessee to intervene in that consolidated proceeding, just as Natural and its interrelated parties had been granted intervention in the proceedings on the Midwestern and Tennessee applications. Thereafter, Midwestern and Tennessee moved for a consolidation of the Natural Gas, et al., proceedings with the Midwestern, et al., proceedings.[14] Natural and its interrelated parties not only opposed this motion, but also petitioned for reconsideration of the grant of intervention to Midwestern and Tennessee. The Commission denied the latter petition on November 21, 1956, and set the Natural case for hearing.[15]

In setting the Natural case for hearing, the Commission directed that there be a prior presentation by each applicant of "evidence as to market demands," after which the record was to be certified to the Commission, so that it could preliminarily decide "the issue of exclusiveness" between the Natural and Midwestern proposals. The preliminary stage of the hearing was completed and the record was certified to the Commission. On that record, the Commission ordered, on March 13, 1957, that "the proceedings upon that portion of the application filed by [Natural] relating to the authorization which it seeks to transport natural gas in interstate commerce and to sell natural gas in interstate commerce to [Peoples and another distributor] in the volume of 115,000 Mcf per day for resale to [the two steel companies] be and it is [*sic*] severed from the proceedings upon the application of Natural * * * insofar as such application and the proceedings thereon relate to authorization sought by Natural * * * to construct and operate facilities and to sell natural gas in interstate commerce to distribution companies located in noncompetitive areas not proposed to be served by Midwestern." This is the first of the orders here under review. The Natural case, minus the severed portion, was directed to proceed to final hearing and decision as provided by earlier order.[16]

Thereafter, on March 29, 1957, the Commission issued an order (1) consolidating the severed portion of the Natural application to be heard with the applications of Midwestern, Northern and Michigan Wisconsin and those interrelated with the latter three applicants;[17] and (2) terminating the intervention of Midwestern and Tennessee in the Natural case. This is the second order here under review.

## III

### The Issues

■ The speedy provision of natural gas to communities which need it is a

---

liver its entire capacity to Natural on a cost-of-service basis and have the latter take over the sales to all of Texas Illinois' distributors. This intra-system change, though an integral part of the Natural proposal, involves no new facilities or service and need not concern us here.

14. There is no order in the record specifically disposing of this motion, but the consolidation order of March 29, 1957, see *infra*, without referring to the motion, presumably granted it in part and denied it in part.

15. By order of November 30, 1956, as modified by order of December 26, 1956, and interpreted by order of January 31, 1957.

16. See supra note 15.

17. Tennessee, for example, was made a party to this consolidated proceeding by virtue of the relation of its application to that of Midwestern. The applicants interrelated with Natural (Texas Illinois, Chicago District, Colorado Interstate and Pacific Northwest) were not joined in the consolidated proceeding.

proper administrative objective. Consolidating applications, to the extent that it complicates the administrative process, is likely to interfere with that objective. Such consolidation is nevertheless required when the applications are mutually exclusive. Ashbacker Radio Corp. v. Federal Communications Comm'n, 1945, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108. And when the Commission adopts a procedure which precludes a true comparative hearing of conflicting applications, review may be sought here without awaiting a grant of one of the applications. Delta Air Lines, Inc., v. Civil Aeronautics Board, 1955, 97 U.S.App. D.C. 46, 228 F.2d 17. If, therefore, as petitioners contend, (1) the law requires a comparative hearing of their applications with those of Natural and its interrelated applicants and (2) the Commission's severance and consolidation orders precluded true comparative consideration, the respondent's argument that the petition to review is premature is not well taken. The question before us, then, is whether the orders complained of precluded a legally required comparative consideration of the respective applications.

The respondent concedes that there is an area of mutual exclusiveness between Midwestern's and Natural's applications as to which Ashbacker requires a comparative hearing, but it maintains that the procedure it adopted assured such a hearing. The petitioners, on the other hand, argue (1) that the Commission's delimitation of the area of mutual exclusiveness was unduly restricted, and (2) that, even as to that restricted area, they were denied a truly comparative hearing.

### A. The Area of Mutual Exclusiveness

In ordering the severance, the Commission held that "there exists an area of 'mutual exclusiveness' as between the applications of Midwestern and Natural," but said:

"It is clear from the record in these proceedings that the area of exclusiveness * * * is in and near the City of Chicago, Illinois, and involves natural gas service to plants of United States Steel Corporation and Inland Steel Company located in that area. It is equally clear that the authorization sought by Natural * * * to sell [to two of its distributors] volumes of natural gas sufficient to serve U. S. Steel and Inland is severable from the other authorization by Natural [sic] * * with respect to its 'project.'" [Emphasis supplied.]

To us it is not "clear from the record" that the area of exclusiveness relates only to the proposed service to the steel companies. If anything is clear from the record, it is that Midwestern, though it specifically named only the two steel companies as its prospective customers in Natural's service area, proposes to supply gas to every customer in that area within economic reach of its line. As we have shown above, Midwestern solicited commitments from the various distributors in Natural's service area. Peoples, the largest of the distributors and Natural's parent company, flatly refused to buy gas from Midwestern. Natural's other distributors, though in need of additional gas and willing to buy it from any certificated supplier, quite naturally would not commit themselves to Midwestern's proposal while Natural was still in competition for the certificate. To say that they would not buy gas from Midwestern even if it became a certificated supplier is unrealistic. To hold that Midwestern's proposal to serve the various distributors in the northern Illinois-Indiana area is not sufficient unless it shows their specific commitments to buy the gas would amount to holding that a new supplier can never come into a one-supplier area.

The view we take of Midwestern's proposal is one elsewhere taken by the Commission. Thus in Kansas Pipe Line & Gas Co., et al., 2 F.P.C. 29, 45 (1939), the Commission said:

"We believe that applicants * * should show, among other things,

that there exist in the territory proposed to be served customers who can reasonably be expected to use such natural-gas service.

" * * * We see no reason to require applicants before us to submit firm commitments for the sale of natural gas in all cases; it is, we feel, enough if applicants show, that, on the basis of experience in similar territory, there are reasonable grounds for anticipating that customers will be attached to the proposed facilities. This approach, we feel, has regard for the practical experience of the natural-gas industry and does not jeopardize the public interest."

The presiding examiner, in his Commission-adopted opinion denying a motion to dismiss Midwestern's application, quoted the above language from the Kansas Pipe Line Co. case, referred to "the admitted need for additional natural gas in the midwest," and said:

"If Midwestern's applications are ultimately granted and the others denied, it seems evident that Midwestern would have to expand the presently proposed system to take care of the needs." 16 F.P.C. at 482–83.

█ In its treatment of Natural's proposal, the Commission recognized the principle that a proposal must be construed according to its broad purport, not confined to specific undertakings. It noted in the severance order that Natural, though specifically allocating 115,000 m.c.f. of gas per day to its distributors for resale to the two steel companies, claimed it could and would dispose of that volume of gas to other customers if it were not authorized to deliver it for resale to the steel companies. The Commission then took the Natural application, for the purpose of determining the

area of mutual exclusiveness with Midwestern's, as proposing sale of the 115,-000 m.c.f. to *unnamed ultimate customers.* Midwestern's proposal to serve customers other than the steel companies in the northern Illinois-Indiana area, though certainly not specific, was no less specific than Natural's proposal to dispose of 115,000 m.c.f. of gas per day to unnamed customers in that area.

█ Furthermore, granting there is room for construction in Midwestern's proposal, we think the Commission, in choosing between a broad construction which would require an over-all comparative hearing and a narrow one which would permit Natural's application to be processed unopposed, must be mindful that speed is not the only element in the public interest. That interest requires also that the gas-hungry midwest be supplied with adequate service on the best possible terms and conditions. In ruling on the motion to dismiss Midwestern's application, the presiding examiner pointed out:

" * * * For example, a comparative hearing might conceivably provide the pathway for effective regulatory action in causing the application or applications ultimately approved to be implemented and enforced in a manner best calculated to meet the under-supply of gas in the midwest. The Commission's opportunity to have all the issues clearly posed and clearly joined and, if necessary, to exert its authority to accomplish needed results in the public interest, should not be nullified by granting the motions to dismiss." 16 F.P.C. at 479–80.

Even where applications are clearly not mutually exclusive, the Commission has power, one way or another, to mold the proposals to the public interest.[18] It

18. See, for example, the New England gas case in which the Commission rejected both applications and invited broader proposals, saying:
"We are concerned here with a public need and demand for natural gas service

in New England generally—*not in a portion of that area and not by a few selected distributing companies in that area.* It is inconceivable that anyone desirous of promoting the public good should urge that we now authorize one

would seem that given a choice of constructions of an application, the Commission should not prefer a construction which tends to preclude broad inquiry into public interest requirements. Broad areas of conflict often could, but seldom should, be resolved into enclaves of competition as narrow as the specific commonly proposed customers. If that policy were adopted, a party seeking to avoid the searching effect of a comparative hearing would only need to give up those customers. But the question would still exist which applicant should, in the public interest, serve those customers. The Commission should not adopt procedures that foreclose full inquiry into broad public interest questions, either patent or latent.

■ We think the Commission should have treated Midwestern's application as a proposal to serve generally the northern Illinois-Indiana area now served by the Peoples system. Under that view of the application, there is need for a comparative hearing as to the various elements of the Midwestern and Natural proposals, such as gas supply, economic feasibility, financing and design of facilities. Respondent contends, however, that despite its restricted construction of the Midwestern proposal, it has provided a procedure for an adequate comparative hearing. This brings us to a consideration of the consolidation order of March 29, 1957.

### B. *The Comparative Hearing*

Having concluded that "it is clear from the record" that the area of mutual exclusiveness between the Midwestern and Natural applications is limited to the proposals to supply gas to the two steel companies, the Commission held it "equally clear" that the proposal to serve the steel companies is severable from Natural's application for authority to expand its system to supply an additional 485,000 m.c.f. per day to the northern Illinois-Indiana area. We have shown that the Commission's first conclusion is far from "clear." Its second conclusion is to us equally *unclear*, for there is certainly no physical severability of facilities to carry the gas proposed for the steel companies from the general system facilities. What the Commission did was to allow the Natural application and its various interrelated applications to go to hearing and decision without the competitive voice of Midwestern and Tennessee being heard and without the comparative merits of their proposals being considered. This it did by imposing on the proceeding a stipulation that none of the additional capacity would be used to supply the 115,000 m.c.f. per day originally scheduled for the steel companies. The question whether this stipulation should be removed was left to be resolved in a comparative hearing with Midwestern. That question and only that question was the "portion" of the Natural application consolidated for comparative hearing.[19]

engaged in a business affected with the public interest *to pick and choose whom it wishes to serve without proper regard for the public good. Nor should we authorize any applicant to render partial service when it is clear at the outset, as shown by this record, that its plans do not provide the full service to which the people of New England are entitled.*" Northeastern Gas Transmission Co. v. Federal Power Comm'n, 3 Cir., 1952, 195 F.2d 872, 875, emphasis in original.

The Commission also has power under § 7(e) of the Natural Gas Act, 15 U.S.C.A. § 717f(e), to impose upon an

applicant conditions required by the public interest.

19. The applications of Pacific Northwest and Colorado Interstate for authority to increase their facilities in order to supply gas to Natural and the application of Chicago District to increase its facilities to carry Natural's added gas to the distributors are, of course, integrated with the Natural application. Accordingly they are all consolidated for processing in the Natural proceeding. But they have nothing to do with the question whether 115,000 m.c.f. per day of the gas sold to Natural's distributors shall be resold to the two steel companies, the

What the Commission consolidated for comparative hearing was the mutually exclusive aspects of the applications of Natural and Midwestern, *i. e.*, Natural's "insofar as such application seeks authorization to *transport* natural gas in interstate commerce and to *sell* natural gas to [distributors] in the total volume of 115,000 Mcf per day for resale to [the two steel companies]," and Midwestern's "insofar as such application seeks authorization to *construct and operate facilities for the transportation and sale* in interstate commerce of 115,000 Mcf of natural gas [to the two steel companies.]" Emphasis supplied. From the difference in description of the aspects of the two applications designated for comparative hearing, it seems plain that Natural's application for authority to *construct and operate expanded facilities* was not to be considered in the comparative hearing. Indeed, without consolidation into the comparative hearing of the applications interrelated with Natural's,[20] such consideration would be impossible. Therefore, on the basis of the Commission's own definition of the issue in the comparative proceeding and its limitation of the parties thereto, we cannot sustain its contention that the comparative proceeding it has provided is an adequate procedure for a comparison of the various elements of the Natural and Midwestern proposals.

The respondent argues, however, that despite the narrowly defined issue and the limitation of parties, the comparative proceeding was designed to permit inquiry into every aspect of Natural's proposal, including even the feasibility of the proposals in the interrelated applications. Indeed we are told that Natural was expected, in the comparative proceeding, to make substantially the same justification of its whole proposal as it made in the separate proceeding on its own application.[21] While this would seem to be foreclosed by the definition of the issue; while it would seem to be impracticable without the presence as parties of interrelated applicants; and while it would seem to contradict the Commission's announced purpose of not complicating and delaying Natural's case by a comparative consideration of factors as to which the Commission thinks there is no mutual exclusiveness; we shall assume for the purpose of this discussion that Natural will indeed put in its whole case, presumably for the purpose of showing that, if authorized to supply the 115,000 m.c.f. per day to the steel companies, it will have the gas and the facilities to carry it. But, however fully Natural presents the elements of its proposal, the Commission's interest in that presentation extends only so far as the elements enter "into the determination of the requirements of public convenience and necessity *in the area of 'mutual exclusiveness.'*" Emphasis supplied. And that area, as has been shown, involves, in the Commission's eyes, only the competing proposals to serve the two steel companies. So, even if the procedure adopted by the Commission permits a *presentation* of all or substantially all relevant evidence, it does not permit a *consideration* of that evidence in determining "the requirements of public convenience and necessity" in the whole northern Illinois-

only "Natural" issue inserted in the comparative proceeding. Accordingly they were left out of that proceeding. By contrast, the applicants interrelated with Midwestern and with the other parties to the comparative proceeding were joined in that proceeding. See note **11** supra.

20. See note 19 supra.

21. Our attention is called to the following language used by the Commission in its order of May 14, 1957, dismissing the appeal of Midwestern and Tennessee from the rejection by the Secretary of their petition for rehearing of the severance and consolidation orders:

"In other words every party must offer in the comparative hearing testimony with respect to each of the elements that would go into the ultimate determination of the certificate application notwithstanding the fact that like evidence may have been presented in connection with another aspect of the same application."

Indiana area which Midwestern wishes to serve. We hold, therefore, that the Commission has not afforded Midwestern the comparative hearing required under Ashbacker.

The Commission would, of course, consider public interest requirements in determining, in the separate noncomparative Natural proceeding, whether Natural should be authorized to construct and operate its expanded facilities. It goes without saying, however, that a comparative hearing casts a brighter light and, in this case, the law requires such hearing. Without it the Commission would close its eyes to the public interest questions raised by Midwestern, such as whether the millions of people in Natural's service area would enjoy less expensive gas if Natural bought from Midwestern rather than expanded its own facilities.

In comparing proposals, moreover, the Commission is not limited to issues pressed by the applicants. Cf. Clarksburg Publishing Co. v. Federal Communications Comm'n, 1955, 96 U.S.App. D.C. 211, 215, 225 F.2d 511, 515. With both proposals before it, it could consider, for example, whether the public interest would be better served by bringing a new supplier into an important population and industrial center presently served by only one supplier, especially when the present supplier is controlled by the largest distributor;[22] whether the long-continued and pressing natural gas shortage in the area should be charged against the Peoples system, in determining comparative fitness to serve future needs; whether it is advisable to tap new sources of gas rather than rely upon the sources from which the Peoples system obtains and proposes to obtain its gas; or whether it is in the public interest to encourage the importation of gas from the large Canadian fields, as proposed by Midwestern, rather than deplete our own reserves. We express no opinion as to any of those issues, recognizing, as we do, that there is probably much to be said on both sides of each of them and that the inquiry is for the Commission to make. We say only that the duty imposed upon the Commission under the Natural Gas Act requires that it make the inquiry. It must therefore not adopt procedures that preclude making it.

The Commission's orders of March 13, 1957, and March 29, 1957, to the extent that they deny full comparative hearing of the applications of Midwestern, Natural and those interrelated with both are set aside and the case is remanded to the Federal Power Commission for further proceedings consistent with this opinion.

So ordered.

REED, Associate Justice, retired, (dissenting).

This Court concludes that the facts in this record require the Federal Power Commission to permit petitioners, the Midwestern Gas Transmission Company and the Tennessee Gas Transmission Company, to participate fully in the hearing on the application of the Natural Gas Pipeline Company of America, and its affiliates, to increase largely its sales capacity. This increased capacity is intended to give additional supplies to its distributing connections in the Northern Indiana-Chicago area. These are Northern Indiana Public Service Company [NIPSCO] and Peoples Gas Light and Coke Company [Peoples]. A part of the proposed increase was to supply the industrial needs of United States Steel Corporation and Inland Steel Company in Chicago, East Chicago, and Gary, Indiana.

For me the validity of the conclusion of this court depends upon whether peti-

22. On April 30, 1958, in Criminal Action No. 58–CR–58, the federal grand jury for the Eastern District of Wisconsin returned an indictment against Peoples and certain other defendants charging violations of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1, 2. Natural, Texas Illinois and Chicago District were named as co-conspirators. The offenses charged relate, *inter alia*, to alleged exclusion of Midwestern from Natural's northern Illinois-Indiana market.

tioners seek an opportunity to serve the same consumers that the Natural Gas Pipeline and its affiliated and distributing companies are serving and seeking to serve—that is, the consumers of Chicago and Northern Illinois. Where competing gas companies seek certificates of convenience and necessity from the Federal Power Commission for service to the same consumer groups, the law requires as a matter of fairness that the FPC hear all applicants in the same proceeding, with opportunity to all parties to examine the proposals of one another, so as to bring out before the Commission the facts necessary for the Commission to properly appraise the public interest as between the contending suppliers. This is the doctrine of Ashbacker Radio Corporation v. Federal Communications Commission, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108. No one questions its soundness, where applicable. In recognition of and in conformity with that rule, the F.P.C. has directed by order of March 13, 1957, in Natural Gas Pipeline Company of America, Docket No. 9966, 17 F.P.C. 469, that the mutually exclusive portions of the applications of "Natural" and "Midwestern", in the view of the Commission, be severed and heard in another proceeding where both are parties —the application of Midwestern in Docket Nos. G–9451 et al., order of March 29, 1957, 17 F.P.C. 461.

There is thus no clear-cut difference between the parties as to the law where applications of different lines seek mutually exclusive certificates of public convenience and necessity. The controversy centers around the facts in this case and the applicability of the recognized rule as to mutually exclusive applications for certificates. In such circumstances, the determination of the administrative agency carries great weight with me. The agency is the selected impartial entity for settling the public interest when rivals seek to serve the same consumers. If Midwestern was seeking an opportunity to serve generally the Chicago-Northern Indiana area with a duplication of Natural's service, such offer would

fall within the Ashbacker Rule. But here Midwestern in that area actually seeks certification only for the steel companies, with vague suggestions, set out in the Court's opinion, that once in the area it may in the indefinite future ask a wider authority.

Congress created the Commission to deal with the public interest, endowed it with a rule-making power to enable it to assure fair opportunity for open competition for service facilities, and charged it with administrative responsibilities. It is the expert body, not the judiciary, that is concerned with where, when and to whom, in the public interest, certificates are to be granted. Cf. National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344; United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081. I am of the view that there was substantial reason for the action of the Commission in entering its two orders for severance and adversary hearing and therefore from the whole record would support the F.P.C. conclusion. O'Leary v. Brown-Pacific-Maxon, 340 U.S. 504, 508, 71 S.Ct. 470, 95 L.Ed. 483.

Briefly my reasons are these. The Court concedes, and the record bears out its statement, that Midwestern "specifically named only the two steel companies as its prospective customers in Natural's service area." It adds that Midwestern "proposes to supply gas to every customer in that area within economic reach of its line." I do not so read the record. The Midwestern application was initiated by an application, filed October 10, 1955, docket No. G–9451, 20 Fed.Reg. 9032. It said:

"The principal market territory to which Applicant's pipeline will make natural gas available lies in Minnesota, Wisconsin, western Michigan and eastern North Dakota. Much of this area is presently without natural gas service, despite the strenuous efforts to get natural gas which have been exerted for many years by public officials and officials of the local gas industry, and it is primarily

service to this long neglected market that Applicant proposes herein."
Every community listed for service was in Minnesota or Wisconsin.

In the original application this general statement appeared:

"Other parts of this general market territory logically should be served by Applicant's pipeline system. Applicant has received many requests for natural gas service from gas distributing companies and industrial plants in this area. Many of these potential customers already enjoy the advantages of natural gas service but the fact that their present supplies are inadequate is forcefully demonstrated by long lists of unaccepted applications for natural gas service. There is no doubt that the entire territory accessible to Applicant's pipeline system will benefit from service by a new natural gas pipeline system whose management has an established reputation for aggressive merchandising of natural gas."

In amendments it was repeated and in 1956 Midwestern listed the two steel companies as prospective consumers. No others have been named. Generalized statements of a desire to obtain more customers wherever profitable to the applicant or to expand into areas of gas shortage outside the limits of its projected service are not enough to occasion admission of Midwestern, by judicial direction, into the application of Natural and its affiliates to obtain certificates to enable it to meet the inadequacies of their present service.

The application of Midwestern states a daily capacity of 401,574 m.c.f. Its supplement of February 7, 1956, to its application sets up an allocation wholly out of the Chicago area except as to the steel companies of 395,998 m.c.f. It would seem to have little to offer the Chicago area consumers.

Natural and its affiliates have a line extending from the gas fields of Texas through Oklahoma, Kansas, Nebraska and Iowa to the Chicago area. Another reaches from the South Gulf Coast region of Texas through Arkansas and Missouri. It obtains quantities of gas from Colorado Interstate and the wells of Kansas. Eighty per cent of their total annual sales are in Chicago and surrounding areas. The balance goes to local gas companies along the lines. Additional gas is available and needed for the area now served. The lines and stations requested for improvements are estimated to cost around eighty million. This immediate need for increased service to the Chicago area led the Commission to exclude from their present consideration the mutually exclusive portions of the Midwestern and Tennessee applications for service to the steel companies. The Commission said:

"We feel that action looking toward increased service to markets presently being served in non-competitive areas should not, where possible, be deferred until after the competitive aspects of the respective applications can be considered and determined."

The Commission further pointed out that in allowing Natural's application to proceed to a grant without the intervention of Midwestern, the Commission was in a position to protect the "limited area of mutual exclusiveness," i.e., the service to the steel companies, by a properly conditioned certificate to Natural. I see no reason why this cannot be done.[1]

Courts should be slow to interfere with routine interlocutory proceedings of administrative agencies. A major advantage of agency, as opposed to judicial proceedings, is their flexibility. If Midwestern desires to serve other consumers than those stated in its application, it can set out its purpose, the needs of the public, and its gas and financial resources. This has not been done.

1. See F.P.C. order of May 14, 1957, in Docket No. G–2306, American Louisiana Pipe Line Company, and other dockets, all involved in Midwestern's pending application. 17 F.P.C. 671.

I would uphold the Commission in its effort to get adequate gas promptly into the Chicago area by affirming its order. The action taken by the Commission was an exercise of its discretion as to how to manage the routine hearings of its applications. Its conclusion was reached after detailed consideration of how to handle a conflict over the service to the steel companies. Under such circumstances courts are to leave decisions "to the expertise of the agency burdened with the responsibility for decision." [2]

---

**2.** Panama Canal Co. v. Grace Line, 78 S. Ct. 752, 758.